**1240**

UNITED STATES of America,
Plaintiff–Appellant,

v.

Frank FERNANDEZ, aka Seal A; aka Sapo; Juan Perez Garcia, aka Seal B; Mariano D. Martinez, aka Seal C; aka Chuy; Jimmy Sanchez; aka Seal D; aka Smokey; Marcel Arevalo, aka Seal F; aka Psycho; Daniel Bravo, aka Seal G; aka Sporty; Robert Cervantes, aka Seal H; aka Gypsy; Roy Gavaldon, aka Seal I; aka Spider; David Gonzales–Contreras, aka Seal J; aka David Contreras–Gonzalez; Robert Mercado, Jr., aka Seal K; aka Gato; Ernesto Murillo, aka Seal L; aka Solo; Roland Ramirez, aka Seal N; aka Capone; aka Rolland Ramirez; Jesus Rochin, aka Seal O; aka Gizmo; Fernando Alvidrez; aka Cuate; Javier Alvidrez Duarte; Mario Castillo; Dominick Shewmaker Gonzales, aka Solo; aka Dominick Gonzales; Gerardo Jacobo, aka Blanco; Adrian Nieto; Sally Peters; Suzanne Schoenberg, Defendants–Appellees.

No. 99–50738.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 2000.

Filed Nov. 7, 2000.

Ronald L. Cheng, (Argued and On the Briefs), Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellant.

Dale Michael Rubin (Argued and On the Briefs), San Marino, California, for defendants-appellees Gerardo Jacobo, Marcel Arevalo, Javier Alvidrez Duarte, Daniel Bravo, Mario Castillo, and Robert Mercado.

Larry M. Bakman, (On the Briefs), Los Angeles, California, for defendant-appellee Gerardo Jacobo.

Michael Belter, (On the Briefs), Riverside, California, for defendant-appellee Marcel Arevalo.

Morton Philip Borenstein, (On the Briefs), Encino, California, for defendant-appellee Javier Alvidrez Duarte.

John Cotsirilos, (On the Briefs), San Diego, California, for defendant-appellee Daniel Bravo.

Michael M. Crain, (On the Briefs), Santa Monica, California, for defendant-appellee Mario Castillo.

Jack M. Earley, (On the Briefs), Costa Mesa, California, for defendant-appellee Robert Mercado.

Before: NOONAN, TROTT, and BERZON, Circuit Judges.

TROTT, Circuit Judge:

The question before us is whether the district court properly sanctioned the United States for violating a discovery order by precluding the government from seeking the death penalty against Fernando Alvidrez, Marcel Arevalo, Daniel Bravo, Javier Alvidrez Duarte, Gerardo Jacobo, and Robert Mercado (collectively "Defendants"). The district court's decision to impose this sanction was based on the government's refusal to turn over its confidential predecisional death penalty evaluation form and prosecution memorandum, which contained information concerning the Attorney General's pending decision whether to seek the death penalty against Defendants. On appeal, the United States argues that the district court's discovery order is clearly erroneous because (1) Defendants have no right to discover these documents, and because (2) the documents are protected by the deliberative process and work product privileges. For the reasons discussed below, we agree with the government. We therefore reverse and remand to the district court.

## I

## FACTUAL BACKGROUND

Defendants, alleged members of the "Mexican Mafia," have been charged with various violations of federal law, including participation in the murders of Richard Serrano, Jose Martin Gutierrez, and Enrique Delgadillo. Because these murders allegedly were committed in furtherance of racketeering activity, *see* 18 U.S.C.A. § 1959(a)(1) (Supp.2000),[1] and involved the use of a firearm, *see id.* § 924(j) (2000),[2] they are punishable by death. This means that the Federal Death Penalty Act (the

---

1. 18 U.S.C. § 1959 provides, in relevant part, that:

   (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished-
   (1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both.

2. 18 U.S.C. § 924 provides, in relevant part, the following:
   (j) A person who ... causes the death of a person through the use of a firearm, shall —
   (1) if the killing is a murder ... be punished by death or by imprisonment for any term of years or for life.

"FDPA"), enacted by Congress in 1994, may apply. *See id.* § 3591 et seq. (Supp. 2000).

The FDPA, which authorizes the death penalty for more than forty federal crimes, sets forth the general procedures for imposing a death sentence in federal cases. First, if the government intends to seek the death penalty for a certain defendant, it must notify the defendant "a reasonable time before trial" of its intent to do so. *Id.* § 3593(a)(1) (Supp.2000). Second, the government must notify the defendant of all aggravating factors that it "proposes to prove as justifying a sentence of death" if the defendant is convicted of the underlying offense. *Id.* § 3593(a)(2). Finally, the FDPA requires separate guilt and penalty phases for a death penalty prosecution. *Id.* § 3593(b).

However, these provisions of the FDPA are implicated only if the government has made an authoritative decision to seek the death penalty. In making this decision, the government is guided by specific provisions in the United States Attorneys' Manual ("USAM" or "Manual") that the Attorney General issued shortly after Congress enacted the FDPA. Generally, the USAM outlines the internal policies and procedures for the prosecution of all federal cases involving death-eligible offenses. *See* USAM § 9–10.000 et seq. (1997).

The Manual provides that, in all federal capital cases, the ultimate decision to seek the death penalty lies with the Attorney General. *Id.* §§ 9–10.020, 9–10.080. Before the Attorney General renders her written decision, however, her assistants must comply with certain operating procedures. To begin, when a United States Attorney charges a defendant with an offense subject to the death penalty, the attorney must submit certain documents to designated persons in the Justice Department. *Id.* §§ 9–10.040, 9–10.070. More specifically, the U.S. Attorney submits a death penalty evaluation form and a prosecution memorandum to the Attorney General's Death Penalty Committee (the "Committee"), which assists the Attorney General in deciding whether to seek the death penalty in a certain case. *Id.* §§ 9–10.040, 9–10.050, 9–10.070. The guidelines require the U.S. Attorney to submit these documents no later than thirty days before the government must file its "Notice of Intention to Seek the Death Penalty." *Id.* § 9–10.040.

Once the U.S. Attorney provides the Committee with these documents, a meeting is held at which the defendant is given an opportunity to persuade the government not to seek the death penalty. Specifically, the guidelines provide that "[c]ounsel for the defendant shall be provided an opportunity to present to the Committee, orally or in writing, the reasons why the death penalty should not be sought." *Id.* § 9–10.050. After this meeting, the Committee then makes a recommendation to the Attorney General, who makes the final decision whether to seek the death penalty in a particular case. *Id.*

## II

### PROCEDURAL BACKGROUND

In the case at bar, defendant Gerardo Jacobo filed a motion on August 30, 1999, prior to scheduling of a meeting with the Committee, in which he sought "Discovery Relevant to Authorization to Seek the Death Penalty." In this motion, Jacobo sought "all information that may tend to mitigate the sentence in this case," so that he could make an "informed, accurate and meaningful presentation to the government." The government opposed the motion, arguing that Jacobo did not have any right to such discovery and, moreover, that the documents at issue were protected by the deliberative process and work product privileges.

On September 27, 1999, the district court held a hearing to consider the motion. During the hearing, the district court opined that the Attorney General's procedure for deciding whether to seek the death penalty was "illusory." Specifically, the district court judge stated:

See, why create this illusion ... if you're defense counsel ... and you were defending somebody, how can you really defend somebody if you can't and you don't know what the other side is saying about them?

The government responded that, although defendants may have a right to discover certain information about the government's case and intentions before trial, such a right does not extend to the meeting before the Committee.

The district court ruled on Jacobo's motion on October 7, 1999, ordering the government to provide all capital-eligible defendants with its completed death penalty evaluation form and prosecution memorandum not later than ten days before each defendant's presentation to the Committee in Washington, D.C. In response, on October 19, 1999, the government filed a "Notice of Non-Compliance with Court's Order and Suggested Procedure," in which the government respectfully but firmly informed the district court that it would not comply with its order dated October 7, 1999.

The district court considered the matter again on October 21, 1999, and made the following ruling:

> Basically [prosecutor] I'm going to put it this way to you. If you don't do what I previously ordered [then] I'm not going to allow the Government to seek the death penalty as against those individuals that have been defined by the Government as being eligible for the death penalty.... Now, if you feel I'm wrong you appeal me.

Nevertheless, the government maintained its position and refused to produce the death penalty evaluation form or the prosecution memorandum. As a result, on October 26, 1999, the district court issued a

written order precluding the government from seeking the death penalty against Defendants unless it complied with the October 7, 1999 discovery order. The United States now appeals from that order.

## III

## JURISDICTION

■ As an initial matter, we must consider Defendants' argument that this court lacks jurisdiction over the United States' appeal because the district court's decision was not a final, appealable order. Defendants' contention lacks merit.

■ In *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), the Supreme Court interpreted 18 U.S.C. § 3731 and held that government appeals in criminal cases are not restricted to the specific categories listed in section 3731.[3] The Court explained that "Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *Id.* at 337, 95 S.Ct. 1013. Under *Wilson,* therefore, a government appeal is barred only if it implicates the concerns protected by the double jeopardy clause of the Fifth Amendment. *See United States v. Hetrick,* 644 F.2d 752, 755 (9th Cir.1980) (holding that, under section 3731, the court had jurisdiction to review a district court's order reducing a sentence).

■ At the same time, as we have previously recognized, section 3731 does not "abolish the final judgment rule of section 1291 for criminal appeals prosecuted by the Government." *United States v. Dior,* 671 F.2d 351, 355 (9th Cir.1982); *see* 28 U.S.C. § 1291 (providing for appeal only "from all final decisions of the district

---

**3.** 18 U.S.C. § 3731 provides, in relevant part, the following:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except

that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

> . . .

> The provisions of this section shall be liberally construed to effectuate its purposes. 18 U.S.C.A. § 3731 (Supp.2000).

courts"). The final judgment rule, however, does not block this appeal. For while discovery orders themselves are not generally "final" for purposes of section 1291, *Church of Scientology v. United States,* 506 U.S. 9, 18 n. 11, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992), "parties who face such an order have the option of making the decision 'final' simply by refusing to comply," and appealing the resulting sanction. *Pennsylvania v. Ritchie,* 480 U.S. 39, 50, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *see also United States v. Richter,* 488 F.2d 170, 172 (9th Cir.1973) (reviewing dismissal of an indictment because of the government's noncompliance with a discovery order); but cf. *Cunningham v. Hamilton County,* 527 U.S. 198, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999) (holding that no interlocutory appeal lies from a purely retrospective, monetary sanction imposed pursuant to Federal Rule of Civil Procedure 37(a)(4)). Accordingly, the Supreme Court has "consistently held that . . . one who seeks to resist the production of desired information [must choose] between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal." *United States v. Ryan,* 402 U.S. 530, 533, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971).[4] Here, the government selected the latter option. It refused to comply with the district court's order, willfully incurring a sanction and thereby rendering the decision final and reviewable. *See United States v. Cheely,* 36 F.3d 1439, 1441 (9th Cir.1994) (not mentioning the § 1291, but implicitly finding an order that the defen-

dant could not be subjected to the death penalty sufficiently final, presumably under the *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) collateral order rule, to permit review).

# IV

# DISCUSSION

## A. Standard of Review

■ We review de novo the question whether the district court had any legal basis for its discovery order. *United States v. Jennings,* 960 F.2d 1488, 1490 (9th Cir.1992). If it did, then the court's choice of a sanction for a violation of its order is reviewed for an abuse of discretion. *Id.*

## B. Analysis

The USAM provides the defendant with an opportunity to appear before the Committee and present reasons why the government should not seek the death penalty. *See* USAM § 9–10.050. Defendants argued to the district court that once the government decides to establish such a procedure, the Sixth Amendment and due process require the government to turn over all mitigating information to Defendants' attorneys so that they might effectively advocate on their clients' behalf. The district court agreed with Defendants and ordered the government to produce the death penalty evaluation form and prosecution memorandum, notwithstanding that Defendants did not request the production of these particular documents. The source of the district court's order

---

4. We express no opinion whether a discovery order disposing of an asserted claim of privilege could be independently appealed under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), a question on which our sister circuits are divided. *Compare Pearson v. Miller,* 211 F.3d 57, 64 (3d Cir.2000) ("An order denying the applicability of a claimed privilege conclusively determines the question, and does so in a way that is effectively unreviewable: once re-

leased, information has lost a measure of confidentiality that can never fully be regained.") *with Dellwood Farms, Inc. v. Cargill, Inc.,* 128 F.3d 1122, 1124 (7th Cir.1997) ("[A] discovery order is not deemed collateral even if it is an order denying a claim of privilege.") and *In Re United States,* 680 F.2d 9, 11 (2d Cir. 1982) ("The assertion of a privilege . . . does not convert what would otherwise be an interlocutory discovery ruling . . . into a collateral, and therefore appealable, order.").

was speculation that without the disclosure, the process would somehow be "unfair:"

> I would think that if I was defense counsel in this case and I'm going to be ... presenting all this [mitigating evidence] ... and then you have so called information that you are going to be feeding the Attorney General and I don't know anything about it I am going to say well that is unfair. That is totally unfair. At least [let] me ... see some of that information because that information you might be spoon feeding the Attorney General is made up.

Because we find that the death penalty evaluation form and prosecution memorandum are privileged documents and find no legal basis for overriding the privilege, we vacate the district court's order requiring production of those materials.

### 1. USAM Guidelines

■ To begin, it is clear that the USAM does not create any substantive or procedural rights, including discovery rights. The USAM explicitly states that

> [t]he Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any manner civil or criminal.

*Id.* § 1–1.100. In addition, several courts, including this circuit, have consistently held that these guidelines do not create any rights in criminal defendants. *See, e.g., United States v. Montoya,* 45 F.3d 1286, 1295 (9th Cir.1995); *United States v. Piervinanzi,* 23 F.3d 670, 682 (2d Cir. 1994); *United States v. Lorenzo,* 995 F.2d 1448, 1453 (9th Cir.1993); *United States v. Busher,* 817 F.2d 1409, 1411 (9th Cir.1987). Thus, the USAM guidelines cannot serve as a legal basis for the district court's discovery order.

### 2. Deliberative Process and Work Product Privileges

■ In addition, the district court's discovery order reached too far because the death penalty evaluation form and prosecution memorandum are protected by the deliberative process and work product privileges.

■ In order to be protected by the deliberative process privilege, "a document must be both (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2) 'deliberative,' meaning 'it must actually be related to the process by which policies are formulated.'" *National Wildlife Fed'n v. United States Forest Serv.,* 861 F.2d 1114, 1117 (9th Cir.1988) (quoting *Jordan v. United States Dep't of Justice,* 591 F.2d 753, 774 (D.C.Cir.1978)). By shielding such documents from discovery, the deliberative process privilege encourages forthright and candid discussions of ideas and, therefore, improves the decisionmaking process. *Assembly of the State of Cal. v. United States Dep't of Commerce,* 968 F.2d 916, 920 (9th Cir. 1992). "It would be impossible to have any frank discussions of legal or policy matters in writing if all such writings were to be subjected to public scrutiny." *National Wildlife,* 861 F.2d at 1117 (internal quotation marks omitted).

Here, the death penalty evaluation form and the prosecution memorandum are both "predecisional" and "deliberative." First, the documents are "predecisional" because the U.S. Attorney submits these documents to the Committee *before* the Attorney General makes the final decision whether to seek the death penalty. *See* USAM §§ 9–10.040, 9–10.050; *see also Federal Trade Comm'n v. Warner Communications, Inc.,* 742 F.2d 1156, 1161 (9th Cir.1984) (holding that for a document to be "predecisional" it must have been generated before the adoption of an agency's policy or decision).

■ Second, the death penalty evaluation form and prosecution memorandum are "deliberative" in that they "contain[ ] opinions, recommendations, or advice about agency policies." *Id.* Specifically,

the USAM requires that the documents contain the following information:

Following (i) an introduction, the prosecution memorandum should include a comprehensive discussion of (ii) the theory of liability, (iii) the facts and evidence, including evidence relating to any aggravating or mitigating factors, (iv) the defendant's background and criminal history, (v) the basis for Federal prosecution, and (vi) any other relevant information. The Death Penalty Evaluation form is intended primarily to be used as a guideline and work sheet for the internal decision making process, and may be hand written.

USAM § 9–10.040. Although the documents at issue include "facts and evidence," which are not protected by the deliberative process privilege, *see Warner Communications*, 742 F.2d at 1161, that factual material is so interwoven with the deliberative material that it is not severable. *See Binion v. Department of Justice*, 695 F.2d 1189, 1193 (9th Cir.1983).

"The evaluation form and memorandum are designed to help the Attorney General decide whether the death penalty is appropriate in any case in which the death penalty is a potential sentence." *Furrow*, 100 F.Supp.2d at 1174. As such, these documents clearly play an integral role in the government's deliberative and policy-making processes and, thus, are protected by the deliberative process privilege. *See id.; see also United States v. Frank*, 8 F.Supp.2d 253, 284 (S.D.N.Y.1998) ("Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty.").

█ Likewise, the more general work product privilege applies to the death penalty evaluation form and prosecution memorandum. In *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court first acknowledged the work product privilege, whose primary purpose is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co. v. United States Dist. Court*, 881 F.2d 1486, 1494 (9th Cir.1989); *see also United States v. Nobles*, 422 U.S. 225, 238–39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (noting that the work product privilege also applies in criminal cases). Additionally, Rule 16 of the Federal Rules of Criminal Procedure recognizes the work product privilege and exempts from production "reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case." Fed.R.Crim.P. 16(a)(2). Thus, the documents in question here fall squarely within the ambit of the work product privilege as they both are internal government documents prepared by the U.S. Attorney in anticipation of litigation. *See Furrow*, 100 F.Supp.2d at 1175; *United States v. Nguyen*, 928 F.Supp. 1525, 1552 (D.Kan.1996).

We therefore conclude that the specific documents at issue in this case—the death penalty evaluation form and the prosecution memorandum—are not subject to discovery because they are protected by the deliberative process and work product privileges.

### 3. Sixth Amendment Right to Counsel

█ Defendants suggest that the Sixth Amendment right to counsel provides some right to discovery so as to assure effective representation, and suggest that that right could override the usual work product and deliberative privileges if those privileges precluded effective representation. We need not decide whether the Sixth Amendment-based discovery premise of Defendants' argument is correct, because the privileged documents the district court ordered the government to disclose would not be discoverable in any event.

█ The Sixth Amendment guarantees a defendant the right to effective assistance of counsel at all critical stages of a criminal proceeding. *United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir.

1997). Critical stages include those in which "potential substantial prejudice to defendant's rights inheres in the particular confrontation and ... [counsel may] help avoid that prejudice." *Schantz v. Eyman*, 418 F.2d 11, 13 (9th Cir.1969) (internal quotation marks omitted). The Supreme Court has further defined a "critical stage" in criminal proceedings as one which affects the defendant's right to a fair trial. *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

We need not decide whether the death penalty authorization process created by the USAM is a "critical stage" of the proceedings. Assuming, without deciding, that the death penalty authorization process is a "critical stage," Defendants still would not be entitled to the death penalty evaluation form and prosecution memorandum because these documents are protected by the deliberative process and work product privileges, and these privileges apply during "critical stages." *See, e.g., Nobles*, 422 U.S. at 239–40, 95 S.Ct. 2160 (recognizing that the work product privilege applies during a criminal trial, as long as the privilege is not waived by its holder); *United States v. Salsedo*, 607 F.2d 318, 320–21 (9th Cir.1979) (holding that criminal defendant's counsel waived work product privilege by referencing the privileged document during cross-examination). We therefore conclude that defendants do not have a right to discover the death penalty evaluation form and prosecution memorandum pursuant to the Sixth Amendment.[5]

**5.** We also reject Defendants' assertion that *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), compels the government to produce the evaluation form and memorandum before the Committee meeting. *Brady* merely requires the government to turn over the evidence *in time for it to be of use at trial. See United States v. Gordon*, 844 F.2d 1397, 1403 ("*Brady* does not necessarily require that the prosecution turn over exculpatory material before trial. To escape the *Brady* sanction, disclosure must be made at a time when disclosure would be of value to the accused.") (internal quotation marks omitted); *see also United States v. Wilson*, 160

## V

## CONCLUSION

In summary, we hold that the district court clearly erred and abused its discretion in issuing the October 7, 1999, discovery order and the subsequent death penalty preclusion order because it lacked a legal basis for either of these orders. We therefore reverse and remand to the district court with instructions to vacate and rescind its order and sanction and to allow the government to proceed with the death penalty authorization process and decision.

REVERSED and REMANDED.

F.3d 732, 742 (D.C.Cir.1998) ("[A] new trial is rarely warranted based on a *Brady* claim where the defendants obtained the information in time to make use of it.").

Nonetheless, "the due process principles announced in *Brady* and its progeny must be applied to" certain pretrial proceedings, such as suppression hearings. *United States v. Barton*, 995 F.2d 931, 935 (9th Cir.1993). Whether or not those principles apply to the Committee meeting, we find that nondisclosure of the government's privileged internal evaluation form and memorandum does not amount to a due process violation.